## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SCOTT LEE SMITH,

CIVIL ACTION NO. 2:17-cv-13367

*Plaintiff*,

DISTRICT JUDGE MARIANNE O. BATTANI

MAGISTRATE JUDGE PATRICIA T. MORRIS

*v.*

COMMISSIONER OF SOCIAL SECURITY,

*Defendant*.

_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
### (Docs. 17, 19)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 17), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 19), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Scott Lee Smith's claim for Supplemental Security Income ("SSI") benefits under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this

1

case was referred to the undersigned Magistrate Judge. (Doc. 4). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (Docs. 17, 18). Defendant has also filed a notice of supplemental authority. (Doc. 20).

Plaintiff had previously filed an application for disability insurance benefits ("DIB") and SSI on November 20, 2008, alleging disability beginning April 1, 2002. (PageID.162) After a hearing, Administrative Law Judge ("ALJ") Charles Headrick issued a decision finding Plaintiff was not disabled. (PageID.159-173). The Appeals Council denied Plaintiff's request for review, and Plaintiff did not pursue the matter further for some years. (PageID.174-178).

Then on May 7, 2012, Plaintiff filed a second application for benefits, for SSI only. (PageID.319-324). He again testified at a hearing, (PageID.130-157), and again received an unfavorable finding—this time from ALJ Robert M. Senander, (PageID.193-209)—but then the Appeals Council remanded his case for further consideration, (PageID.210-214). On remand, ALJ Melissa Warner presided over another administrative hearing. (PageID.84-129). Ultimately, she also found Plaintiff had not been under a disability since the date his application was filed. (PageID.76). And this time, the Appeals Council denied Plaintiff's request for review. (PageID.47). This action followed.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in

the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him unable to engage in substantial gainful activity. 42 U.S.C. §

4

423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff not disabled. (PageID.69-89). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of May 7, 2012. (PageID.63). Next, she determined Plaintiff had the severe impairments of "remote history of left tennis elbow; and cervical dystonia and/or idiopathic torsion dystonia." (*Id.*). Additionally, he had several non-severe impairments: left finger fractures, hyperlipidemia, history of status-post non-ST elevation myocardial infarction, chronic obstructive pulmonary disorder (COPD), mild C5-7 degenerative changes, minor arthrosis in the lumbar spine, small right posterior labral tear, major depressive disorder, generalized anxiety disorder, and polysubstance dependence and abuse in reported remission. (PageID.64-66). He did not, however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (PageID.67). Before proceeding further, the ALJ found Plaintiff had the residual functional capacity (RFC) to perform light work with additional limitations:

5

allowance to change positions every 30 minutes for one to two minutes in the immediate vicinity of the work station; lift and carry 15 pounds occasionally and ten pounds or less frequently; push and pull without limitation but not higher than shoulder height with the right upper extremity; no climbing ladders and the like or crawling; no overhead reaching, and frequent any other reaching with the right upper extremity; frequent handling and fingering bilaterally; frequent exposure to respiratory irritants; and occasional exposure to obvious hazards. The claimant can also: understand, carry out and remember simple instructions where the pace of productivity is not dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt; make judgments on simple work, and respond appropriately to usual work situations and changes in a routine setting; and respond appropriately to supervision, the general public and coworkers.

(PageID.68). At steps four and five, she concluded Plaintiff was unable to perform any relevant past work, but that jobs existed in significant numbers in the national economy that he could perform. (PageID.74-75). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act since May 7, 2012, the date the application was filed. (PageID.76).

### E.  Administrative Record

#### 1.  Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.  Application Reports and Administrative Hearing

##### i.  Plaintiff's Function Report

Plaintiff completed a function report on June 18, 2012. (PageID.376-383). He indicated that he was living alone in a house. (PageID.376). Working was impossible, he

said, "with illness with my arm with torticollis and mental illness . . . . because I'm in constant pain and cannot keep head straight and cannot concentrate." (*Id.*). Asked what he did from the time he woke up until he went to bed, he said only that he was unable to do anything without pain and "must rest all the time." (PageID.377). Prior to onset, he had been able to do factory work and lawn work, bowl, play sports, walk, and lift. (*Id.*). Now, he had to "take more time" to dress and use care when bathing, though he had no difficulty caring for his hair, shaving, feeding himself, or using the toilet. (*Id.*). He prepared microwave meals or pre-cooked meals daily, taking about half an hour to do so. (PageID.378). Although he indicated his cooking habits had changed since onset, he did not explain how. (*Id.*). He needed reminders to take his medication. (*Id.*).

Plaintiff reported that he could not do any household chores "because of limitation"; on a follow-up question, however, he stated he needed reminders "for the few things I can do." (*Id.*). He went outside daily. (PageID.379). His medication prevented him from driving. (*Id.*). About once a week, his family took him shopping for 45 minutes. (*Id.*). Paying bills, handling a saving account, counting change, and using a checkbook or money orders presented no obstacle for him. (*Id.*).

On a daily basis, Plaintiff enjoyed watching television and reading, though he had found it hard to concentrate since onset. (PageID.380). He also attended weekly family functions, which he needed to be reminded of and accompanied to. (*Id.*). He had no problems getting along with family, friends, neighbors, or authority figures, and had never been fired or laid off from a job because of problems getting along with other

people. (PageID.381-382). Due to his "limitation," he stayed home "all the time." (*Id.*). His pain and "mental issues" kept him from sleeping. (PageID.377).

Asked which abilities were affected by his illnesses, injuries, or conditions, Plaintiff marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (*Id.*). He estimated he could not lift more than two or three pounds. (*Id.*). He could walk about five minutes before needing to rest until the next day. (*Id.*). He could pay attention for forty-five minutes, but did not finish what he started, had a hard time concentrating on written instructions, and followed spoken instructions "slowly." (*Id.*). He handled changes in routine "not well" and stress "not very well," and tended to keep to himself. (PageID.382).

A doctor had prescribed him a brace—for what, he did not indicate—and glasses, which he needed to use "constantly." (PageID.382). Additionally, some of his medications caused him side effects: the Botox caused a dry throat, shortness of breath, and back pain; the Celexa caused dry mouth and drowsiness; and the Vistaril caused drowsiness. (PageID.383).

### ii.  Third Party Function Report

Plaintiff's mother, Rose H. Smith, also completed a function report on June 18, 2012. (PageID.364-375). She stated that she spent at least four hours with him every day. (PageID.364).

She, too, said it would be "impossible" for Plaintiff to work. (*Id.*). This she attributed to Plaintiff's complete lack of "muscle use" in his left arm and his torticollis, which "constantly" caused him pain; he was forced to sit "constantly" to relieve neck and back pain. (PageID.364-365). His daily routine encompassed "nothing productive, because he [could] not function properly." (PageID.364).

Prior to onset, he had been able to do factory work and lawn work and to socialize, as well as fish, bowl, and play sports. (PageID.365, 369). Plaintiff's mother also reported that his pain and "mental issues" troubled his sleep, that he could dress and shave "slowly," and that he needed to be "very careful" while showering due to his neck and back. (PageID.365). Otherwise, he was able to perform personal care without issue, including caring for his hair, feeding himself, and using the toilet. (*Id.*). She confirmed that Plaintiff remained able pay bills, count change, handle a savings account, and use a checkbook or money order. (PageID.367).

On a daily basis, he made microwave meals "when available" and "when able." (PageID.366). As Plaintiff needed reminders to take his medication, his mother laid out his medications every day. (PageID.366). He also needed help with yard and house work due to his "physical impairments," though Plaintiff's mother also indicated he did "small chores all day." (PageID.366-367). He also went out every day. (PageID.367). His mother or other family members drove him to weekly family events, as Plaintiff was no longer able to drive "because of medication and limitations." (PageID.367-368). Plaintiff grocery shopped for microwave food and necessities "for around an hour and the family

helps." (PageID.367). And Plaintiff's mother estimated he spent ten hours weekly at doctor appointments. (PageID.368).

Like Plaintiff, she marked that his illnesses, injuries, or conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, and concentrate, in addition to his memory. (PageID.369). She explained: "All of the things marked are from illnesses and limit him to very min[imum] task[s]. Can lift not even 1 gal[lon] milk." (*Id.*). He could walk about an eighth of a mile before needing to stop and rest until "hours later." (*Id.*). By the estimate of Plaintiff's mother, he could pay attention for an hour, but could not finish what he started. (*Id.*). His torticollis made reading difficult. (*Id.*). He was able to follow doctors' verbal orders. (*Id.*).

Plaintiff could "not handle any stress" and handled changes in routine "not well." (PageID.370). Asked whether she had noticed any unusual behaviors or fears in Plaintiff, his mother responded: "keeps to himself and depression." (PageID.370).

Plaintiff's mother then repeated his report that he needed an unspecified brace and glasses at all times, and that his Botox, Celexa, and Vistaril caused side effects including a dry throat, shortness of breath, back pain, and drowsiness. (PageID.370-371). Lastly, she commented, "A heart condition keeps him from lifting. Stress and on lots of med for heart. Mental health issues, depression, anxiety, sleep issues. And on several meds for this and all the above issues has made it impossible to hold a job. He is in constant pain." (PageID.371).

### iii.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on September 2, 2015. (PageID.84). To begin, Plaintiff's attorney advised the ALJ that he would forward additional medical records from Dr. Diment, Lenawee Community Mental Health, and the Michigan Pain Institute. (PageID.87-91). He emphasized that Dr. Diment's records were "really important" because "one of the reasons this was remand[ed], was because the shoulder hadn't been properly addressed and things like that." (PageID.88). The ALJ acknowledged the missing records and a deadline of two weeks was set for their submission. (PageID.91).[1]

The ALJ then began questioning Plaintiff. Plaintiff relayed basic information including that he had been living in a mobile home for about three years, though he still received his mail at his parents' address because it was "a safe, secure address." (PageID.92). Plaintiff was fifty-two years old and divorced; at the time of the hearing, he had been dating a woman who ran a home daycare for about a year. (PageID.93). He supported himself via food stamps and state disability benefits, which he had been receiving for about four years. (PageID.94). Plaintiff estimated he had not had a driver's license for about fifteen years, since he lost it due to drinking and driving. (PageID.93-94). His parents had driven him to the hearing. (PageID.93). He had his GED. (PageID.94).

---

[1] The later-submitted evidence appears in the record at PageID.858-1103.

Plaintiff had worked for a temporary agency called Fastco Industrial Services in 2008. (PageID.94-95). He had also worked full-time as a spray painter and convertibles tester at two different Duro shops. (PageID.96).

Most of Plaintiff's past positions, however, he had held only briefly. He had spent more than a month in only one position, at a factory that made brake lines, where he had been placed by temporary agency Man Power. (PageID.95). He could not recall the exact dates he had worked. (*Id.*). He explained he had worked there "for a little bit longer than a month, but they let [him] go because [he] couldn't keep up on an assembly line". (*Id.*).

In 2002, he had worked for about three years packing cabinets into boxes for Marric Industries, until the business closed. (PageID.95-96). He described it as "a heavy job," putting cabinets in cardboard boxes. (*Id.*). At first he testified that the heaviest amount of weight he had to lift was about fifty pounds, but he went on to explain that he had "spun" the product and "it was just like lifting it up"; he then testified the heaviest amount he had to "actually" lift was thirty to forty pounds. (PageID.96).

While working that job, Plaintiff was hit on the head with an object, which "knocked everything out of line" and caused persistent neck and back pain. (PageID.98-99). His understanding was that nerve damage was the root of the problem, which had plagued him for about five years; he had not sought treatment for "a long time" due to his lack of insurance. (PageID.97-98). He received injections every three months but the efficacy diminished after the first two months, leaving him "in all pain for the whole third month." (PageID.97). For that month he would be "pretty much limited to the house" and have to "lean [his] head back against something sturdy, because [his] neck muscle gets

12

real weak." (*Id.*). Lying down with his feet propped up and a pillow for his back also offered some relief. (PageID.108). He lay down for about four hours a day, and usually slept for an hour of that time. (*Id.*). Plaintiff had recently started seeing a new physician, who had recommended surgery on his back. (PageID.105).

Plaintiff estimated he could walk about a block, but was limited by pain in his neck and back, as his neck pain disturbed his balance. (PageID.97). His lower back pain also sometimes traveled up. (PageID.98). Further, he would be out of breath after half a block because of his COPD, which he had had for six or seven years. (PageID.105-106).

He estimated he could stand or sit for ten to fifteen minutes at a time, limited by his lower back pain. (PageID.99). (Plaintiff changed position several times during the course of the hearing.) (PageID.101, 109). He could not lift and carry a gallon of milk in each hand; at most, he could lift four pounds in his left hand and fifteen to twenty in his right. (PageID.101). From standing, he could not bend and touch his knees without "real bad pain." (*Id.*). He had difficulty reaching at or above shoulder height with both arms—he had a right shoulder injury and "no muscle in [his] left arm at all." (PageID.101-102). His left hand would "get[] real weak real quick," and he "could feel" his right shoulder problem when moving his arm or hand. (*Id.*). He experienced constant pain in his left elbow, which worsened when he tried to use it. (PageID.114).

He had had surgery on his shoulder, which "worked for the first six months to a year," but his shoulder then regressed and became "a lot worse" than before, despite physical therapy. (PageID.111-112). His physicians had told him there was nothing else to be done for his shoulder. (PageID.112).

13

Further, Plaintiff had headaches two to three times a week, which 800 Motrin eased, though not completely. (PageID.114). A couple of times a month, too, Plaintiff felt he did not want to be around people or leave the house due to his depression. (PageID.102, 107). He explained that he was currently depressed due to his financial situation. (PageID.107). He also suffered from "real bad" anxiety, which made his legs shake constantly and made focusing difficult. (PageID.106-107). And he complained of chest pains two or three times a week, when he started breathing hard. (PageID.114-115). He regularly saw a cardiologist and had a stress test scheduled in six months. (PageID.115).

As he had had a heart attack five or six years previously, he took cholesterol and blood pressure medication, as well as inhalers for his COPD, Motrin, Norco, Trazodone for depression and anxiety, and Effexor for anxiety. (PageID.103-104). The Trazodone sometimes caused him to sweat, which, combined with his shoulder pain, woke him some nights. (PageID.104).

He had not had anything alcoholic to drink since 2010, and he attended AA meetings once or twice a week. (PageID.102). He had not used marijuana since 2010 or 2011. (PageID.108). He smoked half a pack of cigarettes a day, down from a pack a day about three years prior. (PageID.111). Plaintiff had been incarcerated in 2009 and served ten months for violation of probation. (PageID.103).

Plaintiff was able to handle his personal needs, such as showering, dressing, and feeding himself. (PageID.110). He complained, however, that he ate from a TV tray set up in front of his couch, and the position caused him back pain that suppressed his

appetite. (*Id.*). He estimated he had lost fifteen pounds over the past three years. (*Id.*). Plaintiff explained he had help with all his household chores because he could not lift anything heavy. (PageID.109). He could vacuum one room at a time, and had to sit down periodically while doing the dishes. (*Id.*). His girlfriend, who lived across the street from him, or his mother went with him to do grocery shopping and help lift heavy objects. (PageID.108-109).

For entertainment, he watched sports on television. (PageID.110). He went fishing once or twice during the "good months" following an injection, on a pontoon boat where could "just drop [hi]s line" and did not have to use his shoulder to cast out. (PageID.102-103). He had last golfed about eight years ago and last bowled about ten. (PageID.103).

Plaintiff testified that his pain became "worse every day," and that while he had good days—when he had received his injections and he was "just at home, not doing" anything—he had "a lot more bad days." (PageID.99-100).

### iv.  The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Roxanne Benoit also testified. (PageID.115-128). Plaintiff's attorney asked some preliminary questions about her qualifications because her resume had not been exhibited. (PageID.116-118). The ALJ then declared that Plaintiff's only past relevant work was as a cabinet packer, which the VE classified as "hand packer," unskilled work at medium. (PageID.119). Next, the ALJ posed her first hypothetical:

> [A]ssume the individual can perform the functions of medium work, except
> . . . lifting 50 pounds rarely, rarely meaning less than occasionally but not
> completely precluded, 25 pounds occasionally, and lesser weights

> frequently; push and pull without limitation but not higher than shoulder height; no climbing ladders and the like or crawling; with the right upper extremity, rare overhead reaching and frequent other reaching; frequent exposure to respiratory irritants; occasional exposure to obvious hazards; the individual can also understand, carry out, and remember simple instructions where the pace of productivity is not dictated by an external source over which the individual has no control, such as an assembly line or conveyor belt; respond appropriately to supervision, the general public, and coworkers.

(PageID.120). That hypothetical person would not be able to perform Plaintiff's past work because of the frequent reaching in all directions, according to the VE. (PageID.120-121). But he would be able to perform other work, such as a food service worker (83,000 jobs in the national economy; 1,000 in Michigan), a laundry worker (105,000 jobs in the national economy; 2,000 in Michigan), or an order picker (13,000 in the national economy; 500 in Michigan). (PageID.121). Further, she noted that the Dictionary of Occupational Titles was silent on some of the limitations as to reaching and on the sit/stand option, so she relied instead on her "experience and training as a vocational counselor and placing people in jobs." (PageID.121,126). Otherwise, all her testimony was in line with the DOT. (PageID.126).

Second, the ALJ inquired what result if the exertional category changed to light work, with all else from the first hypothetical held constant. (PageID.122). The VE responded that other work would be available; for example, as a cafeteria attendant (40,000 jobs in the national economy; 200 in Michigan), a mail clerk (140,000 jobs in the national economy; 2,500 in Michigan), or a sorter (25,000 jobs in the national economy; 1,200 in Michigan). (PageID.121-122).

Third, if all else remained the same, but the exertional category was sedentary, jobs would be available including as a document preparer (80,000 jobs in the national economy; 4,500 in Michigan), a final assembler (29,000 in the national economy; numbers unavailable for Michigan), and a table worker (12,000 in the national economy; 700 in Michigan). (PageID.122).

Moving on, the ALJ asked whether the VE's answer to any of the hypotheticals would change with the additional limitation of no overhead reaching with either extremity. (PageID.122). The VE replied that nothing would change. (PageID.123). And if the ALJ additionally limited the hypothetical person to frequent handling and fingering, again, the VE indicated that none of her answers would change. (*Id.*). If an allowance were added for the hypothetical person to change position every thirty minutes for one to two minutes, in the vicinity of the work station, the VE's answers to either the sedentary and light exertional level hypotheticals would remain unchanged, so long as the worker stayed on task. (*Id.*). At the medium level of exertion, "that would make it difficult," but the VE thought some jobs would remain. (PageID.123-124).

The ALJ then asked the VE to reconsider the first three hypotheticals, assuming the hypothetical person now had the ability to "sit, stand, or walk for six of eight hours each; lift 15 pounds occasionally and 10 pounds or less frequently." (PageID.124). The VE replied that her answers would not change—jobs would remain at the sedentary and light levels, but not at medium. (*Id.*).

Lastly, the ALJ designed a new hypothetical:

Light work, except no overhead reaching with the right upper extremity; occasional other reaching with the right upper extremity but only with one to two pounds . . . ; frequent handling, fingering, pushing, and pulling; no climbing ladders, ropes, and scaffolds; occasional climbing ramps and stairs; frequent balancing, stooping, kneeling, crouching, and crawling; no exposure to heights or driving machinery; occasional exposure to moving party; frequent exposure to humidity, respiratory irritants, temperature extremes, and vibration; and simple work that is not fast-paced, meaning no work where the pace of productivity is dictated by an external source over which the individual has no control, such as an assembly line or conveyor belt.

(PageID.124-125).

As all jobs at the light and sedentary levels would require at least frequent reaching, the VE explained, all would be eliminated. (PageID.125-126). Further, she stated that an ordinary workday included one thirty-minute and two fifteen-minute breaks. (PageID.126). For an unskilled worker, an employer might tolerate one or two absences per month during a probationary period of sixty to ninety days; following that, "missing even one [day] consistently every month"—excluding any accrued time off— would likely incur reprimand or termination. (*Id.*). Additionally, being off task more than fifteen percent of the time would be work-preclusive. (*Id.*). She also testified that there is no allowance to lie down during the course of a workday. (PageID.120).

Lastly, Plaintiff's attorney clarified that once Plaintiff turned fifty years old, he would "grid out" if he were limited to work at the sedentary level. (PageID.128).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 20 C.F.R. § 416.920. The regulations carve the evidence into categories:

18

"acceptable medical sources" and other sources. *Id.* § 416.927.[2] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 416.902(a) (effective June 13, 2011 to March 26, 2017). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. § 416.913(d) (effective September 3, 2013 through March 26, 2017). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (rescinded effective March 27, 2017). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his RFC. *Id.* § 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* § 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see*

---

[2] This provision, 20 C.F.R. § 416.927, applies to claims filed before March 27, 2017, as Plaintiff's was. For claims filed on or after March 27, 2017, the rules in § 416.920c would apply. 20 C.F.R. § 416.927.

*also* 20 C.F.R. § 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 416.927(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1).

### G. Analysis

Plaintiff rests his claim of error on two grounds: first, that the ALJ failed to consider all the evidence, in violation of the Appeals Council's remand order; and second, that the regulations direct a finding of disability due to his age. I address each in turn, as well as the Notice of Supplemental Authority filed by Defendant regarding a recent Sixth Circuit decision, *Earley v. Comm'r of Soc. Sec.*,893 F.3d 929 (6th Cir. 2018). (Doc. 20).

### 1.  The ALJ's Compliance With the Remand Order

First, Plaintiff contends that the ALJ erred by not complying with the Remand Order from the Appeals Council, which instructed the ALJ to, in relevant part, "[o]btain additional evidence concerning the claimant's left shoulder tear s/p a fourth metacarpal

fracture of the left hand, coronary artery disease s/p myocardial infarction with NY Heart Classification I, hypertension, cervical dystonia, history of depression and anxiety and history of substance abuse, in order to complete the administrative record." (*Id.* at PageID.1136) (referring to PageID.210-214). Instead, Plaintiff avers, the ALJ looked "only . . . at the records involved from the date of the current application (May 7, 2012)[,] rather than the entire record." (*Id.*).

As an initial matter, however, Defendant suggests this Court lacks the jurisdiction to consider whether the ALJ complied with the Appeals Council's order on remand. The Sixth Circuit has not spoken on the issue; district courts in the circuit are divided.

Of the courts in the Sixth Circuit that have considered the question, most have found they lacked jurisdiction to evaluate whether an ALJ complied with a remand order from the Appeals Council. Their reasoning is based in the fact that federal courts are courts of limited jurisdiction, and have been authorized to evaluate only "the final decision of the Commissioner." 42 U.S.C. § 405(g). Where the Appeals Council denies a claimant's request for review of an ALJ's decision—as it did here, after the most recent hearing, (PageID.47)—the Court reviews the decision of the ALJ rather than the findings of the Appeals Council. 20 C.F.R. § 416.1481. These courts therefore regard the ALJ's compliance with an Appeals Council remand order as an internal agency matter that arises prior to the issuance of the agency's final decision, and thus falls outside the court's jurisdiction. *E.g.*, *Brown v. Comm'r of Soc. Sec.*, No. 1:08CV183, 2009 WL 465708, at *5 (W.D. Mich. Feb. 24, 2009) (finding the court lacked jurisdiction to review whether the ALJ complied with the Appeals Council's remand order); *Coleman v.*

*Berryhill*, Case No. 1:16CV00931, 2017 WL 1208760, at *16–17 (N.D. Ohio Feb. 17, 2017) (same); *Cooper v. Colvin*, No. 5:13-CV-00217, 2014 WL 2167651, *2 (W.D. Ky. May 23, 2014) (same); *Prichard v. Astrue*, No. 2:08–0055, 2011 WL 794997, at *15 (M.D. Tenn. Feb. 28, 2011), *report and recommendation adopted*, 2011 WL 113755 (M.D. Tenn. Mar. 25, 2011) (same); *Riddle v. Astrue*, No. 2:06-00004, 2009 WL 804056, at *19 (M.D. Tenn. Mar. 25, 2009) (same); *Shope v. Comm'r of Soc. Sec.*, No. 2:14-cv-2055, 2015 WL 3823165, at *8–9 (S.D. Ohio June 19, 2015), *report and recommendation adopted*, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015) (same).

A few courts, however, have found that an ALJ's failure to follow Appeals Council directives in a remand order is a procedural error, considering the Commissioner's own regulations state: "The administrative law judge *shall* take any action that is ordered by the Appeals Council . . . ." (emphasis added). 20 C.F.R. § 416.1477. And the Sixth Circuit has indicated that an ALJ's failure to follow certain procedural requirements "denotes a lack of substantial evidence" requiring remand. *Salvati v. Astrue*, No. 3:08-CV-494, 2010 WL 546490, at *6 (E.D. Tenn. Feb. 10, 2010) (citing *Blakely v. Comm'r of Soc. Sec.*, No. 08–6270, 2009 WL 3029653 at *7 (6th Cir. Sept. 24, 2009)). *Also, e.g.*, *Godbey v. Colvin*, No. 1:13CV-00167-HBB, 2014 WL 4437647, at *5 (W.D. Ky. Sept. 9, 2014) (holding that the claimant "has not received fair process as a result of the ALJ's failure to comply with the Commissioner's procedural requirement regarding directives in remand orders"); *Salvati v. Astrue*, No. 3:08-CV-494, 2010 WL 546490, *5–8 (E.D. Tenn. Feb. 10, 2010) ("[A]n ALJ's failure to follow the dictates of a remand order is an error that necessitates remand when it makes meaningful

judicial review of the ALJ's decision is [sic] impossible. . . . Substantial evidence alone does not excuse non-compliance with the Appeals Council's remand order.") (internal citation omitted).

Meanwhile, a few courts have assumed, without deciding, that such an error may justify reversal and remand. *Keating v. Comm'r of Soc. Sec.*, No. 3:13-CV-487, 2014 WL 1238611, at *14–15 (N.D. Ohio Mar. 25, 2014); *Kearney v. Colvin*, 14 F.Supp.3d 943, 950 (S.D. Ohio 2014); *Schults v. Colvin*, 1 F.Supp.3d 712, 715–17 (E.D. Ky. 2014); *Long v. Comm'r of Soc. Sec.*, No. 2:11–cv–00343, 2012 WL 4009597, *2–3 (S.D. Ohio Sept. 12, 2012).

Even courts in the Eastern District of Michigan have reached different conclusions on separate occasions. *Compare Kaddo v. Comm'r of Soc. Sec.*, 238 F.Supp. 3d. 939, 943–44 (E.D. Mich. 2017) ("[T]he failure by an ALJ to follow a remand order from the Appeals Council, even if that failure is allowed to stand by a later Appeals Council ruling, can constitute a reversible error in federal court. . . . regardless of whether substantial evidence otherwise supports the Commissioner's final decision."), *with Jones obo Jones v. Comm'r of Soc. Sec.*, No. 16-11206, 2017 WL 9476833, at *8 (E.D. Mich. Apr. 21, 2017) ("[E]ven if the ALJ failed to follow the Appeals Council's instructions, such a deficiency is unreviewable by this Court."), *report and recommendation adopted*, 2017 WL 3262444 (E.D. Mich. July 31, 2017); *Sharay v. Comm'r of Soc. Sec.*, Case No. 15-12531, 2016 WL 8114220, at *1 (E.D. Mich. Aug. 28, 2016), *report and recommendation adopted*, 2016 WL 5539791 (E.D. Mich. Sept. 30, 2016) (same);

*Peterson v. Comm'r of Soc. Sec.*, No. 09–11222, 2010 WL 420000, at *7 (E.D. Mich. Jan 29, 2010) (same).

In this case, Defendant acknowledges the lack of consensus but maintains that the Court does not have jurisdiction, without suggesting any particular reason the Court should follow the majority view. (Doc. 19 at PageID.1152-53). Plaintiff does not address the issue. (Doc. 17). Nevertheless, I find persuasive the majority's reasoning that an Appeals Council remand order, and the ALJ's compliance with that order, are internal agency proceedings occurring prior to the "final decision" that a federal court has jurisdiction to review. I therefore suggest the Court here follow "the overwhelming majority of courts in this circuit," *Sharay*, 2016 WL 8814220, at *16, and limit its review to an analysis for the ALJ's decision itself, and not its compliance with the Appeals Council's remand order.

Although Plaintiff makes little effort to expound on his argument that the ALJ erred in not looking at the entire record, I note that his accusation also suggests error under 20 C.F.R. § 416.912. That provision has been amended since Plaintiff filed his disability claim, but at the time, § 416.912(b) read: "Before we [the Social Security Administration] make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." 20 C.F.R. § 416.912(b) (amended March 27, 2017). While that is so, the ALJ is under no requirement to discuss each piece of evidence

individually. *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, at *2 (6th Cir. 2011) (citing 20 C.F.R. § 404.953).

Plaintiff accuses the ALJ of "look[ing] only at the records involved from the date of the current application (May 7, 2012) rather than the entire record," in dereliction of her duty. (Doc. 17 at PageID.1336). In truth, the ALJ simply recognized that "it is unnecessary to consider whether the claimant was disabled prior to the date of the claimant's current application . . . since the claimant is only eligible for benefits on that date, and the period being adjudicated by this decision is from May 7, 2012 through the date of" the ALJ's decision. (PageID.61) Thus, she assigned "no weight" to records dated prior to May 7, 2012. (*Id.*). (citing PageID.437-442, 443-446, 448-506, 507-532, 539-595, 596-601, 603-605, 607-669, 689-699). "While considered," she explained, that "evidence does not provide pertinent information regarding the claimant's residual functional capacity as of May 7, 2012, through the date of this decision," the relevant time period. (PageID.61). She therefore declined to discuss it in detail, although she did mention some of that evidence elsewhere in her decision. (*Id.*); (PageID.64, 65, 69) (discussing and citing to evidence dated prior to May 7, 2012).

The ALJ also acknowledged several times her duty to consider the entire record. *See* (PageID.62) ("Although supplemental security income is not payable prior to the month following the month in which the application was filed . . . , the undersigned has considered the complete medical history consistent with 20 C.F.R. 416.912(d).")[3];

---

[3] As explained above, the provision 20 C.F.R. § 416.912 has since been amended, but at the time of the ALJ's citation to 20 C.F.R. § 416.912(d), it stated: "Before we make a

(PageID.63) ("After careful consideration of the entire record, the undersigned makes the following findings . . . .").

Thus, I suggest the ALJ properly considered the entire record, including evidence dated prior to May 7, 2012, even if she assigned some evidence little or no weight. And as Plaintiff does not challenge the weight assigned to any piece of evidence or explain how the evidence would lead to a finding of disability—Defendant actually suggests that the evidence supports a *less* favorable finding, (Doc. 19 at PageID.1152)—I suggest this argument must fail.

### 2.   Medical Vocational Rule 201.14

Second, Plaintiff avers that because he entered the age category of "closely approaching advanced age," Medical-Vocational Rule 201.14 directed a finding of disability. (Doc. 17 at PageID.1136-1137). As Defendant points out, however, Medical-Vocational Rule 201.14 directs a finding of disability for claimants who are closely approaching advanced age *and* "limited to sedentary work." 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1, § 201.14. Here, the ALJ found Plaintiff had the RFC to perform a range of light work. Aside from the argument addressed and dispatched above, Plaintiff raises no other argument that the ALJ's RFC determination lacks the support of substantial evidence. And nowhere does he suggest that he should be limited to sedentary work, let alone explain why. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir.

_____

determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." 20 C.F.R. § 416.912(b) (effective April 20, 2015 to March 27, 2017).

2013) (The Sixth Circuit "has consistently held that arguments not raised in a party's opening brief . . . are waived."). I suggest, therefore, that that this argument also fails.

### 3. *Earley*

One final matter remains. On August 8, 2018, Defendant filed a Notice of Supplemental Authority regarding the Sixth Circuit's recent case *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), which clarified the application of the doctrine of *res judicata* in Social Security cases.

Previously, in *Drummond*, the Sixth Circuit held that the "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997). The Social Security Administration then issued an Acquiescence Ruling on *Drummond*:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902 (June 1, 1998).

Recently, however, the Sixth Circuit clarified the meaning of *Drummond*. In *Earley*, a Social Security Administration ALJ had thought *Drummond* precluded him from revisiting an earlier finding that the claimant was not disabled unless she offered new and material evidence of a changed condition. *Earley*, 893 F.3d at 931. But "[t]hat is not how it works." Rather, the Sixth Circuit explained, "[a]n individual may file a second

application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory condition." *Earley*, 893 F.3d at 932.

Courts applying *Earley* to litigation that arose before that case have asked whether the ALJ, despite following *Drummond*, gave the new evidence a fresh look. If so, then the ALJ's decision satisfied the mandates of *Earley*; if not, then remand was appropriate. *See Dugan v. Comm'r of Soc. Sec.*, __ F. App'x __, 2018 WL 2769401 (6th Cir. 2018) (post-*Earley* Sixth Circuit decision finding ALJ pre-*Earley* appropriately considered administrative *res judicata* where she ultimately found new and material evidence of medical improvement meant she was not bound by a prior ALJ's determination); *Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. Sept. 17, 2018) (overruling objection and adopting R&R affirming Commissioner where ALJ had issued decision pre-*Earley* but still conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kimball v. Comm'r of Soc. Sec.*, No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. Aug. 7, 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *report and recommendation adopted*, 2018 WL 4095081 (Aug. 28, 2016). *Cf. Seabolt v. Berryhill*, 2018 WL 3545382, at *3 at n. 4 (N.D. Ind. July 23, 2016) (finding that "*Earley* had not been decided when the ALJ opined on Seabolt's case and therefore does not control this Court's analysis of the ALJ's decision").

Here, the ALJ recognized in her opinion that *Drummond* was at the time the current case law in the circuit, and that he therefore "must adopt the prior restrictions made by a previous Administrative Law Judge unless new and material evidence shows that there has been a change or would support an alternate conclusion." (PageID.61). The ALJ went on to find that "new evidence [was] submitted with regard to the period after the prior Administrative Law Judge decision that is material as it reveals the existence of medically determinable impairments that were not previously considered and a change in the severity of the medically determinable impairment that was considered." (*Id.*). As this new material evidence led to different findings, the ALJ did not adopt the findings of the prior ALJ that Plaintiff had had the RFC to perform medium work with additional non-exertional physical limitations, but instead took a "fresh look" at the entirety of the record. (*Id.*). I suggest, therefore, that *Earley* does not require the Court to remand this case for further consideration.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Remand Pursuant to Sentences Four and Six, (Doc. 17), be **DENIED**, the Commissioner's Motion, (Doc. 19), be **GRANTED**, and this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a

copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 26, 2018     S/ PATRICIA T. MORRIS
                  Patricia T. Morris
                  United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 26, 2018                    By <u>s/Kristen Castaneda</u>
                                          Case Manager